UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

ALPHA DEVELOPMENT GROUP L L C : CASE NO. 2:21-CV-00991
ET AL

VERSUS : JUDGE JAMES D. CAIN, JR.

LIBERTY MUTUAL INSURANCE CO : MAGISTRATE JUDGE KAY

## MEMORANDUM RULING

Before the court is a Motion for Partial Summary Judgment [doc. 28] filed by defendant Ohio Security Insurance Company ("Ohio Security") seeking dismissal of certain claims filed by plaintiffs Alpha Development Group LLC ("Alpha") and Mike Reese. Plaintiffs oppose the motion. Doc. 33.

## I.
### BACKGROUND

This suit arises from damage inflicted by Hurricane Laura and Hurricane Delta, which made landfall in Southwest Louisiana on, respectively, August 27 and October 9, 2020, as well as a tornado that struck the same area on October 27, 2021. These weather events allegedly caused damage to a 48,000 square foot storage warehouse ("the property") owned by Alpha, of which Mike Reese is the managing member, and located at 2925 Industrial Avenue, Lake Charles, Louisiana, 70615. Doc. 27, att. 2, p. 14; doc. 27, att. 3, p. 13. Since 2016 the warehouse has been leased to Bayou Services, LLC, a moving and storage company managed by Charles "Vic" Vicknair. Doc. 27, att. 3, p. 13.

At the time Hurricane Laura and Hurricane Delta struck, the property was insured by a commercial property insurance policy issued by Ohio Security to Alpha and bearing policy number BKS 57187893. Doc. 28, att. 10, ¶ 4. At the time the October 2021 tornado struck, the property was insured by a commercial property insurance policy issued by Ohio Security to Alpha and bearing policy number BKS 57181878. *Id.* at ¶ 5. Both policies provide a limit of insurance of $3,711,969 for the building at replacement cost, subject to a two percent deductible for windstorm or hail. *Id.* at 33. The policies further provide:

> 3. Replacement cost
> . . . .
>   d. We will not pay on a replacement cost basis for any loss or damage:
>     (1) Until the lost or damaged property is actually repaired or replaced; and
>     (2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

*Id.* at 94. Finally, the policies provide the following with respect to code upgrades:

> 4. Additional Coverages
> . . . .
>   e. Increased Cost of Construction
>     (1) This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.
>     (2) In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in e.(3) through e.(9) of this additional coverage.
>     . . . .
>     (6) The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less. If a damaged building is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building, is the lesser of: $10,000 or 5% times the value of the damaged building as of the time of loss times the applicable Coinsurance percentage.
>     The amount payable under this Additional Coverage is additional insurance.
>     (7) With respect to this Additional Coverage:

>> (a) We will not pay for the Increased Cost of Construction:
>> (i) Until the property is actually repaired or replaced, at the same or another premises; and
>> (ii) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

*Id.* at 83–84.

Plaintiffs submitted claims after both hurricanes, but subsequently withdrew the Delta claim because Vicknair admitted he was unable to differentiate between the damage from the two storms. Doc. 28, att. 2, pp. 109–110. The parties agreed to handle all damage through the Hurricane Laura claim. *Id.* Plaintiffs filed suit in this court on April 14, 2021, raising claims of breach of contract and bad faith against Ohio Security based on the latter's alleged failure to timely and properly adjust the claim and remit payment for covered losses. Doc. 1. Six months later, while still covered by an Ohio Security policy, the property was impacted by a tornado and the southeast corner of the building collapsed. Plaintiffs amended their complaint, alleging that the collapse was a direct result of Ohio Security's mishandling of the Laura claim because the company had refused to cover replacement of the roof and because the hurricane-damaged roof surface allowed water to further damage the roof deck. Doc. 15.

The case proceeded through the streamlined settlement process outlined in the court's Case Management Order ("CMO") for first-party insurance claims arising from Hurricanes Laura and Delta, but did not resolve. It is now set for a jury trial before the undersigned on November 14, 2022. Doc. 17. Ohio Security brings this Motion for Partial Summary Judgment, asserting that:

1. The court should dismiss plaintiffs' Hurricane Delta claim

2. The court should dismiss all claims associated with Business Income/Extra Expense, because the policy limit has been paid.

3. The court should rule on summary judgment that plaintiffs are limited to the $10,000 policy limit for code upgrades and increased costs of construction, and should dismiss plaintiffs' claims for penalties under Louisiana Revised Statute § 22:1892 to the extent they are associated with code upgrades.

4. The court should dismiss plaintiffs' bad faith claim under Louisiana Revised Statute § 22:1973 for consequential damages because plaintiffs have failed to prove any such damages.

5. The court should limit plaintiffs' claims for bad faith penalties and fees under § 1892 to, at most, the actual cash value of plaintiffs' alleged damages.

Doc. 28, att. 1. Plaintiffs oppose the motion. Doc. 33.

## II.
### SUMMARY JUDGMENT STANDARD

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). He may meet his burden by pointing out "the absence of evidence supporting the nonmoving party's case." *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). The non-moving party is then required to go beyond the pleadings and show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To this end he must submit "significant probative evidence" in support of his claim.

*State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

### III.
### LAW & APPLICATION

Under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity jurisdiction applies the substantive law of the forum state. *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 687 (5th Cir. 1991). Louisiana law provides that an insurance policy is a contract and that its provisions are construed using the general rules of contract interpretation in the Louisiana Civil Code. *Hanover Ins. Co. v. Superior Labor Svcs., Inc.*, 179 F.Supp.3d 656, 675 (E.D. La. 2016). The words of the policy are given their generally prevailing meaning and "interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." *Coleman v. Sch. Bd. of Richland Par.*, 418 F.3d 511, 516–17 (5th Cir. 2005) (citing La. Civ. Code arts. 2047, 2050). Ambiguities in the policy must be construed against the insurer and in favor of coverage. *Id.* The court resolves an ambiguity by asking "how

a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered." *Id.*

### A. Hurricane Delta Claim

Ohio Security first moves for dismissal of plaintiffs' Hurricane Delta claims on the grounds that plaintiffs cannot identify any damage caused by that storm. The court has addressed this argument in terms of plaintiffs attempting to double the policy limits based on damages from the two storms:

> As it relates to Coverage A, the court disagrees. "Louisiana law does not allow for double recovery of the same element of damages," which is in the nature of a punitive or exemplary award. *Albert v. Farm Bureau Ins. Co.*, 940 So.2d 620, 622 (La. 2006). The policy covers only one dwelling and the limits under Coverage A represent the replacement cost for that dwelling, as agreed to by plaintiffs when they purchased the policy. The court allows that recovery under separate policy limits would be justified in the event that plaintiffs had begun repairs following one occurrence and then suffered additional damage in the second. Here, however, plaintiffs have admitted that they made no repairs to the dwelling. Accordingly, holding UPC liable for two policy limits covering the same dwelling would amount to exemplary damages. Plaintiffs already have such a remedy available under Louisiana Revised Statutes §§ 22:1892 and 22:1973, and the motion must be granted in this regard.

*Touchet v. UPC*, 2022 WL 710621, at *2 (W.D. La. Mar. 9, 2022); *accord Schumacher v. UPC*, No. 2:21-cv-1435, doc. 40 (W.D. La. Aug. 15, 2022).

Plaintiffs withdrew their Delta claim based on Vicknair's admission that he was unable to differentiate between the damage from the two storms. Doc. 28, att. 2, pp. 109–110. In their opposition, however, they argue that "[t]here is no question that, to some degree, Hurricane Delta caused additional damage" and that there is separate coverage available for these damages. Doc. 33, pp. 5–6. They further argue that the case is distinguishable from *Touchet* because neither party is arguing that the warehouse is a total loss. *Id.* Plaintiffs miss the mark, however—in the absence of any claim for repairs made under Laura coverage that must have been redone due to

damage caused by Delta, there is no basis for doubling policy limits or otherwise attempting to segregate the damages at this time. Accordingly, summary judgment should be granted as to this claim.

### B. Business Income/Extra Expense

Ohio Security next seeks dismissal of any claim arising from business income/extra expense coverage on the grounds that it has paid the policy limit on this coverage. Plaintiffs do not dispute that policy limits were paid but do dispute the timeliness of such payments. To this end they assert that they provided receipts for equipment rental on July 16, 2021, and for HVAC rental on August 4, 2021, but allege that they did not receive payment until after the roof collapse on October 27, 2021. Doc. 33, att. 4; doc. 33, att. 2, pp. 170–72. Ohio Security shows, however, that the payments were actually issued on August 11 and 20, 2021, respectively—less than a month after submission. Doc. 35, atts. 1 &wes 2.

Louisiana Revised Statute § 22:1892 makes an insurer liable for penalties and attorney fees in certain circumstances based on its bad faith handling of a claim. To prevail under this statute, the insured must show that (1) the insurer received satisfactory proof of loss; (2) the insurer failed to tender payment within 30 days of receiving this proof; and (3) the insurer's failure to pay is "arbitrary, capricious, or without probable cause." *Guillory v. Lee*, 16 So.3d 1104, 1126 (La. 2009). Similarly, Louisiana Revised Statute § 22:1973(B)(5) provides for an award of penalties when an insurer fails to pay within 60 days and that failure is "arbitrary, capricious, or without probable cause." Plaintiffs have admitted that policy limits were tendered under this coverage and fail to show a genuine issue of fact as to whether any payments were untimely. Accordingly, summary judgment will be granted as to this claim.

### C. Code Upgrades and Cost of Construction

Included in the estimate prepared by plaintiffs' contractor, CIA Services, is $277,580.19 for "Code Upgrades," to "Bring remainder fire system to code" and "Remove[] damaged section of fire system." Doc. 28, att. 9, exh. 1, p. 25. Clay Heath, CIA Services consultant, also acknowledged that the estimate called for replacing the concrete masonry unit walls at all elevations at a total cost of $970,950.49, and that the new walls would be reinforced with concrete and grout even though the old walls had been unreinforced. *Id.* at 26; *id.* at exh. 1, p. 23. Plaintiffs' engineer, Jason Duhon, admitted that only one of the four walls had collapsed after the storm and that the other three, while cracked, were being replaced due to code requirements. Doc. 28, att. 6, pp. 47–50. Duhon emphasized, however, that repairing rather than replacing the still-standing walls was "very difficult" and that this difficulty as well as the code requirements lay behind his recommendation. *Id.* at 50–51, 109–10. Finally, Duhon testified that the roof structure on the front canopy needed to be replaced because of code upgrades. *Id.* at 110.

Ohio Security asks the court to rule that plaintiffs are limited to the $10,000 allowed under the policy, supra, for code upgrades and increased costs of construction for the costs described above. At the very least, it asserts, this limitation should apply to the $277,580.19 expense for "Code Upgrades." Furthermore, it argues, the court should dismiss plaintiffs' claim for penalties associated with such upgrades because no amounts are due under that provision unless and until the upgrades are complete. Plaintiffs oppose the motion, asserting that the damages do not arise because of the enforcement of code upgrades but rather because it is the only way to repair the covered physical losses to the structure resulting from Hurricane Laura.

Plaintiffs point to two decisions from the Louisiana appellate courts, *Royal Cloud Nine, LLC v. Lafayette Insurance Company*, 987 So.2d 355 (La. Ct. App. 4th Cir. 2008) and *Mason v. Shelter Mutual Insurance Company*, 209 So.3d 860 (La. Ct. App. 3d Cir. 2016). These cases involved a policy exclusion pertaining to "any loss or damage if it would not have occurred in the absence of . . . [e]nforcement of any ordinance or law regulating the construction, use, repair or demolition of a building or other structure," including "the increased costs incurred to comply with an ordinance or law." *Mason*, 209 So.3d at 869. In both matters, the courts determined that the exclusion did not apply because the increased cost to repair the properties in compliance with applicable regulations resulted from the covered natural disaster rather than the enforcement of those requirements. *Id.* at 869–70; *Royal Cloud Nine*, 987 So.2d at 359–60.

The "Additional Coverage" provision here appears to be an artful rephrasing of the same attempts to avoid covering these increased costs. As with *Royal Cloud Nine* and *Mason*, however, plaintiffs have shown that the structure was damaged by a covered peril and that there is at least an issue of fact as to whether it can legally be repaired without these building upgrades. Accordingly, summary judgment should be denied as to the applicability of the $10,000.00 code upgrade/increased cost of construction limit. As for the bad faith portion of the claim, plaintiffs have provided no opposition. The court agrees that, to the extent a jury determines that any repairs fall within the $10,000.00 code upgrade limit, no sums are due until the upgrades have actually been made. Summary judgment is therefore denied as to any penalty/bad faith claim arising therefrom.

### D. Consequential Damages

Plaintiffs seek consequential damages under Louisiana Revised Statute 22:1973. Under this statute an insured may recover damages in the amount of two times the damages sustained

or five thousand dollars, whichever is greater, based on an insurer's violation of its duty of good faith and fair dealing. La. Rev. Stat. 22:1973(C). Plaintiffs have alleged that the October 2021 roof collapse "was a direct consequence of [Ohio Security's] arbitrary and capricious decision to deny" their request for a full roof replacement. Doc. 39, ¶ 39. They also assert consequential damages through the increased cost to bring the CMU walls up to code after the collapse, *supra*, and additional expenses incurred such as rented warehouse space. Doc. 28, att. 12, p. 5.

Ohio Security moves for summary judgment on this claim, asserting that plaintiffs have presented no evidence that the roof collapse was caused by its handling of the Hurricane Laura claim. In addition to pointing to plaintiffs' lack of evidence of causation, it points out that plaintiffs' engineer Jason Duhon testified that the roof collapse occurred because of wind loads on the CMU walls rather than the brittleness of the gypcrete. Doc. 28, att. 6, pp. 129–30. As it also noted, however, Duhon did not address the roof failure in his report. Meanwhile, plaintiffs' contractor Jason Williams testified that he had observed water damage to the roof deck on an inspection with the roofing subcontractor Phoenix Restoration and Ohio Security field adjuster Richard Leggett on October 21, 2020:

> And so, we walked through. We were looking at the ceiling, which would be the bottom side of the roof deck. I recall seeing some water stains just at various locations. And then we got up on the roof; and [Phoenix Restoration] was there. And we walked the roof. I remember the roofing subcontractor agreeing with me that they felt like the roof needed to be replaced. And I believe he actually knew Richard Leggett. And from that point on, after we did our inspection, I anticipated hearing back from the insurance company and being able to work collaboratively at what a defined scope of work should be; and that didn't happen.

Doc. 28, att. 5, p. 38. Williams also confirmed that emailed the Ohio Security desk adjuster on January 7, 2021, after becoming "irritated with no movement," and stated: "As a follow-up to my voicemail, the roof needs to be removed and replaced. Please let me know when an engineer

Page 10 of 13

is available and we will meet him on site." *Id.* at 60–61. The following day, Williams's company provided Ohio Security with a rebuild estimate that included replacement of every layer of the roof above the gypsum. *Id.* at 75–76, 98–100.

Williams also elaborated on his opinion on the need for roof replacement prior to the collapse:

> **Q.** I know later there's the opinion that the entire roof needs to be replaced?
>
> **A.** Yes.
>
> **Q.** Would you agree with me that at least based just on perimeter leaks and roof penetration leaks, that does not on its own mean that the roof needs to be replaced?
>
> **A.** No, I don't know that I would agree with that.
>
> **Q.** Tell me why I'm wrong.
>
> **A.** Well, you had mechanical damage. You had the perimeter. You had the roof penetrations. But knowing that the substrate underneath the roof is a gypsum product, what happens is when it gets wet, it—it becomes like mud. If you can imagine taking a piece of drywall and dumping water on it and rub your finger on the edge of the drywall, it becomes soft. And when it becomes soft, it becomes heavier. And so, the type of substrate that is at that facility, you do not want that to occur. Because it's my opinion that's why the thing fell to begin with. It gradually was becoming heavier because it was getting more moist. You have a roof that failed on one end and then you have it in the center of the building, which tells me that there has to be—that had to be damp to overload those bar joists and fell [*sic*] like it did.

*Id.* at 43–44. He further described how this damage made the roof section more susceptible to collapse in the October 2021 tornado:

> I believe those areas had to be the most saturated and I believe the—the gypcrete, which is the deck, as we've discussed, had been taking on water and I believe that the weight of the deck on the structural steel bar joists had increased and I believe that that was the predominant reason while—why the area sustained some storms. I don't believe it was a tornado that did this. I believe that it was probably a heavy wind with a storm; and finally, it gave out. Because at this point in time, you have

>   to realize how long we've been arguing about this roof. And all we've been doing is patching.

*Id.* at 107. Williams's testimony creates an issue of material fact as to causation for the roof collapse, as earlier replacement of the roof might have prevented the roof deck from becoming water-logged and this factor might have contributed to the partial collapse. Accordingly, summary judgment will be denied on this portion of the claim.

Likewise, Ohio Security contends that to the extent any code upgrades are necessary, these are a result of the hurricane itself and not its handling of the claim. To this end it notes that cracks in the CMU walls are visible in photographs from January 2021 and thus predate the October 2021 tornado. Doc. 28, att. 8, pp. 57–72; *id.* at Exhs. D1–D4. In return plaintiffs point to Duhon's testimony that the CMU walls would need to be replaced "[d]ue to the actual damages sustained from the hurricane and the storm, the 2021 storm." Doc. 28, att. 6, pp. 30–31. Accordingly, issues of fact likewise preclude summary judgment on this claim.

Finally, Ohio Security argues that the extra expenses incurred by plaintiffs' tenant as a result of the collapse are (1) not covered under the policy, for which Bayou Services is not a beneficiary, and (2) not consequential damages of the collapse, because plaintiffs cannot establish that the collapse was caused by Ohio Security's handling of the Laura claim. As it notes, the penalty statutes are strictly construed under Louisiana law. *E.g.*, *Reed v. State Farm Mut. Auto. Ins. Co.*, 857 So.2d 1012, 1020 (La. 2003). Plaintiffs allege that they are legally liable for Bayou Services' increased expenses through the warranty of fitness owed by landlords under Louisiana law. However, no judgment has been entered against plaintiffs on that basis and the court cannot determine consequential damages based on the mere possibility that Bayou Services (which is separately pursuing a claim with its own insurer) would attempt to hold plaintiffs liable.

Additionally, the plain language of 22:1973 provides no basis for holding an insurer liable for the consequential damages to third parties of an insurer's bad faith handling of a claim. Summary judgment is therefore denied as to the availability of this category of consequential damages.

### E. Limitation of Penalties to Actual Cash Value

Finally, Louisiana Revised Statute 22:1892 provides for penalties in an amount up to fifty percent of "the amount found to be due from the insurer to the insured[.]" Ohio Security maintains that this amount should be limited to actual cash value, because the policy only provides for actual cash value until repair or replacement has been made. Assessment of penalties, however, is tied to Ohio Security's failure to timely tender that amount and enable plaintiffs to make repairs. The policy is one for replacement value; in other words, the insurer has admitted that it will owe the full depreciation once repair/replacement is made. Accordingly, the motion is denied in this respect and the jury may consider the full difference between the amount paid by Ohio Security and whatever the actual replacement cost value of the claim is determined to be.

## IV.
### CONCLUSION

For the reasons stated above, the Motion for Partial Summary Judgment [doc. 28] will be **GRANTED IN PART** and **DENIED IN PART**.

**THUS DONE AND SIGNED** in Chambers on the 11th day of October, 2022.

_____
JAMES D. CAIN, JR.
**UNITED STATES DISTRICT JUDGE**